IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA,

    v.

CHERI LEA RAU,

      Defendant.

CRIMINAL ACTION FILE

NO. 4:18-CR-003-03-MLB-WEJ

## NON-FINAL REPORT AND RECOMMENDATION RE: DEFENDANT RAU'S MOTION TO SUPPRESS POSTAL SEARCH EVIDENCE [741] AND PERFECTED MOTION TO SUPPRESS EVIDENCE FROM POSTAL SEARCH [756]

Defendant Cheri Lea Rau filed a Motion to Suppress Postal Search Evidence [741], which she subsequently perfected in a Motion to Suppress Evidence from Postal Search [756]. Ms. Rau seeks to suppress all evidence seized by law enforcement officers pursuant to the following search warrants:

1.    1:08-MJ-875, signed August 4, 2008, by United States Magistrate Judge Alan J. Baverman (copy filed as Def.'s Ex. 1 [756], at 7-12);

2.    1:08-MJ-1110, signed September 26, 2008, by United States Magistrate Judge E. Clayton Scofield, III (copy filed as Gov't Ex. B [771-1], at 4-13);

3.    1:08-MJ-1146, signed October 3, 2008, by United States Magistrate Judge C. Christopher Hagy (copy filed as Gov't Ex. C [771-1], at 14-21);

4.      1:08-MJ-1155;[1]

5.      1:08-MJ-1371, signed November 19, 2008, by Judge Baverman (copy filed as Gov't Ex. D [771-1], at 22-32); and

6.      1:09-MJ-22, signed January 8, 2009, by Judge Hagy (copy filed as Gov't Ex. E [771-1], at 33-41).

(Def.'s Perfected Mot. to Supp. [756], at 1.)  The affiant on all six search warrant

applications was USPI Wagner.  (Id.)

Although Ms. Rau's Perfected Motion makes reference to all six search

warrants, she makes specific arguments in her Motions regarding only three of

them—1:08-MJ-875 (Def.'s Perfected Mot. to Supp. [756], at ¶¶ 2-10); 1:08-MJ-

1110 (Def.'s Mot. to Supp. [741], at ¶¶ 1-3); and 1:09-MJ-22 (Def.'s Perfected

Mot. to Supp. [756], at ¶ 11.)  Thus, the undersigned deems her challenge to the

other three search warrants (1:08-MJ-1146, 1:08-MJ-1155, and 1:08-MJ-1371)

---

[1] Because the Government was unable to locate a copy of the Application and Affidavit for Search Warrant 1:08-MJ-1155, it attached a Word version of that document which had been retained by the averring Postal Inspector.  (See Gov't Resp. [771], at 6 n.1 and Ex. F thereto [771], at 42-47.)  From another affidavit authored by U.S. Postal Inspector ("USPI") Jessica L. Wagner, the Court can determine that this warrant issued on October 9, 2008.  (Gov't Ex. E [771-1], at 41 ¶ 14.)

abandoned and **RECOMMENDS** denial of her Motions with regard to these three search warrants on that basis.

As for the three search warrants to which defendant makes specific reference, as discussed below, Ms. Rau lacks standing to challenge them, but even if she had standing, there would be no basis to suppress the evidence seized pursuant to those search warrants because probable cause existed for their issuance. Finally, even if probable cause were lacking, the "good faith" exception to the exclusionary rule applies. See United States v. Leon, 468 U.S. 897 (1984). Therefore, the undersigned **RECOMMENDS** that defendant's Motions to Suppress [741, 756] be **DENIED**.

## I.   THE INDICTMENT

On February 8, 2018, a grand jury in this District returned an Indictment [1] charging Cheri Lea Rau and others with violations of federal law, including RICO conspiracy (Count 1), conspiracy to possess and distribute controlled substances and substantive drug offenses (Counts 2, 19), carjacking (Count 3), attempted murder (Counts 4, 6, 13-14), kidnapping (Counts 9, 11), maiming (Count 10), assault (Count 12), and various firearms violations (Counts 5, 7-8, 15-18, 20-21). The charges are based on the defendants' alleged activities as

members or associates of a criminal enterprise known as the Ghostface Gangsters ("GFG").

With specific reference to Ms. Rau, the Indictment charges her in Count 1 with RICO conspiracy; and in Count 2 with conspiracy to traffic a controlled substance and alleges that she is responsible for the distribution of at least 500 grams of methamphetamine (a Schedule II controlled substance), a substance containing a detectable amount of cocaine (a Schedule II controlled substance), a mixture and substance containing a detectable amount of marijuana (a Schedule I controlled substance), and a substance containing Alprazolam (a Schedule IV controlled substance). The grand jury returned a Superseding Indictment [279] on August 22, 2018. The Superseding Indictment adds three defendants and new overt acts and substantive charges involving drug sales, firearms, and witness tampering. However, the charges against Ms. Rau were left unchanged.

## II.   ANALYSIS

### A.   Standing

The Government contends that Ms. Rau lacks standing to challenge the three search warrants at issue, Nos. 1:08-MJ-875, 1:08-MJ-1110, and 1:09-MJ-22.[2]  As discussed below, the Court agrees.

Although the question of whether a search or seizure violates the Fourth Amendment rights of a particular defendant is often referred to as "standing," it is more properly subsumed under Fourth Amendment doctrine.  Rakas v. Illinois, 439 U.S. 128, 139 (1978).  The analysis focuses on whether the challenged search "violated the Fourth Amendment rights of [the] criminal defendant who seeks to exclude the evidence."  Id. at 140.  "It is immaterial if evidence sought to be introduced against a defendant was obtained in violation of someone else's fourth amendment rights.  Fourth amendment rights are personal and cannot be asserted vicariously."  United States v. Arango, 912 F.2d 441, 445 (10th Cir. 1990); see also United States v. Cooper, 203 F.3d 1279, 1284 (11th Cir. 2000) ("Fourth Amendment rights, however, are personal, and only individuals who actually

_____

[2] The Government concedes that Ms. Rau has standing to challenge search warrant 1:08-MJ-1371.  (See Gov't Resp. [771-1], at 16.)  However, as discussed above, Ms. Rau has abandoned any challenge to that search warrant.

enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search.").  The defendant has the burden of establishing that her own Fourth Amendment rights were violated by the challenged search.  Rakas, 439 U.S. at 130 n.1.

With specific reference to letters, individuals do not surrender their expectations of privacy in closed containers when they send the containers by mail or common carrier.  United States v. Van Leeuwen, 397 U.S. 249, 251 (1970); United States v. Smith, 39 F.3d 1143, 1144 (11th Cir. 1994).  Both senders and addressees of packages can reasonably expect that the government will not open the package.  United States v. Villarreal, 963 F.2d 770, 773-74 (5th Cir. 1992).  Individuals may also assert a reasonable expectation of privacy in packages addressed to them under fictitious names.  United States v. Garcia–Bercovich, 582 F.3d 1234, 1238 (11th Cir. 2009) (citing Villarreal, 963 F.2d at 774); United States v. Richards, 638 F.2d 765, 767, 770 (5th Cir. 1981) (holding that a defendant who opened a post office box for "Mehling Arts & Crafts" had a reasonable expectation of privacy in a package addressed to Mehling).[3]

_____

[3] In United States v. Pierce, 959 F.2d. 1297 (5th Cir. 1992), the court held that where the defendant is neither the sender nor the addressee on the package,

The Eleventh Circuit has noted that other circuits have held there is no legitimate expectation of privacy where defendant is neither the sender nor addressee of a letter or package. Smith, 39 F.3d at 1145; see also United States v. Banks, 3 F.3d 399, 402 n.2 (11th Cir. 1993). In Smith, the Eleventh Circuit upheld a finding that the defendant had no reasonable expectation of privacy in a letter where he was neither the sender nor addressee and gave equivocal testimony regarding his ownership interest in it.

As stated in United States v. Campbell, 434 F. App'x 805 (11th Cir. 2011), "[a] defendant may have a reasonable expectation of privacy in a package even where the package is not addressed in the defendant's name, provided that he establishes a connection between himself and the addressee." Id. at 809. However, the Campbell court found it insufficient that one of the defendants was "on the lease" to the house where the package was delivered, when he was neither the sender nor addressee on the package, he did not establish a connection to the

---

he has no privacy interest in the same. Id. at 1303. The court further noted that because the "only [admitted] interest in suppressing the package and its contents [was] to avoid its evidentiary force against him," his Fourth Amendment claim of standing was rejected. Id.

named addressee, and he did not show that he used the name on the package as an alias. <u>Id.</u>

Defendant Cheri Lea Rau is neither the sender nor the addressee on the items of mail referenced in search warrant 1:08-MJ-875 (Def.'s Ex. 1 [756], at 7-12); search warrant 1:08-MJ-1110 (Gov't Ex. B [771-1], at 4-13); and search warrant 1:09-MJ-22 (Gov't Ex. E [771-1], at 33-41).

One item of mail listed in search warrant 1:08-MJ-875 was addressed to "Terry Rau." However, defendant Cheri Lea Rau does not claim to be this person, she has not established a connection to the named addressee, and she does not contend that she used the name listed on this item of mail as an alias. <u>See</u> <u>Campbell</u>, 434 F. App'x at 809. She also does not claim that the sender made a mistake in spelling her name.

Two items of mail listed in search warrant 1:08-MJ-1110 were addressed to "Sheryl Rau." However, defendant Cheri Lea Rau does not claim to be this person, she has not established a connection to the named addressee, and she does not contend that she used the name on these two items of mail as an alias. <u>See</u>

8

<u>Campbell</u>, 434 F. App'x at 809.  She also does not claim that the sender made a mistake in spelling her name.[4]

Finally, the letter addressed to "Terry Rau" referenced in search warrant 1:08-MJ-875, and the letters addressed to "Sheryl Rau" referenced in search warrant 1:08-MJ-1110, were mailed to 3834 Wynntuck Circle, Kennesaw, Georgia 30152.  (<u>See</u> Def.'s Ex. 1 and Gov't Ex. B, respectively.)  Defendant claims that this is the address of a rental property she owns.  (Def.'s Perfected Mot. [756], at 2.)  Assuming the truth of that claim, it is irrelevant because Cherri Lea Rau is not the addressee on any of those letters.  Thus, the undersigned **REPORTS** that defendant Cheri Lea Rau has no standing to challenge the three above-listed search warrants.

### B. There Was Probable Cause for Issuance of all Three Warrants, <u>but Even if it Were Lacking, the Good Faith Exception Applies</u>

Assuming that Ms. Rau had standing to challenge the three search warrants at issue (which she does not), as discussed below, there was probable cause for their issuance.  But, even if probable cause was lacking, <u>Leon</u>'s good faith exception applies.

---

[4] None of the mail listed in search warrant 1:09-MJ-22 was addressed to anyone with the last name of Rau.

As explained in <u>United States v. Martin</u>, 297 F.3d 1308 (11th Cir. 2002), <u>Leon</u> held that "courts should generally not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." <u>Id.</u> at 1313 (citing <u>Leon</u>, 468 U.S. at 922).

The good faith exception applies in all but four circumstances:  (1) where the magistrate or judge is misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate or judge wholly abandons his or her judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending on the circumstances of the case, a warrant is so facially deficient that the executing officers could not have reasonably presumed it to be valid.  <u>Martin</u>, 297 F.3d at 1313.

As explained by the Eleventh Circuit:

> The <u>Leon</u> good faith exception requires suppression "only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause."  The purpose of the exclusionary rule is to deter unlawful police misconduct; therefore, when officers engage in "objectively reasonable law enforcement activity" and

have acted in good faith when obtaining a search warrant from a
judge or magistrate, the Leon good faith exception applies.

Martin, 297 F.3d at 1313 (internal citations omitted).

Although Ms. Rau argues in these Motions that probable cause did not
exist for issuance of these three search warrants,[5] she has not asserted that the
affidavits supporting them were so lacking in indicia of probable cause as to
render official belief in their existence entirely unreasonable.

To answer the question whether this exception to Leon applies, the
Eleventh Circuit directs a court "to look to the face of the particular affidavit at
hand in order to determine whether the warrant[s are] so devoid of probable cause
that [USPI Wagner]'s belief in [their] validity at the time [they were] issued was
entirely unreasonable." Martin, 297 F.3d at 1313. Courts are directed to conduct

---

[5] The Supreme Court defines "probable cause" as a "fair probability that
contraband or evidence of a crime will be found in a particular place." Illinois v.
Gates, 462 U.S. 213, 238 (1983). The determination of whether probable cause
exists must be made in light of the "totality of the circumstances." Id. The task
of the issuing magistrate is simply to make a practical, common-sense decision
whether, given all the circumstances set forth in the affidavit before him,
including the "veracity" and "basis of knowledge" of persons supplying hearsay
information, there is a fair probability that contraband or evidence of a crime will
be found in a particular place. Id. "Probable cause deals 'with probabilities.
These are not technical; they are the factual and practical considerations of
everyday life on which reasonable and prudent men, not legal technicians, act.'"
Id. at 241 (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)).

that examination because every affidavit and every set of circumstances leading up to a warrant is unique; therefore, each affidavit underlying a search warrant should be examined thoroughly for probable cause (or an unreasonable lack of it) on a case-by-case basis.  Id.  Pursuant to that direction, the Court reviews the three affidavits USPI Wagner submitted to obtain the search warrants.

### 1.   **1:08-MJ-875**

USPI Wagner's affidavit supporting search warrant 1:08-CV-875 begins with some background concerning her training and experience.  (Def.'s Ex. 1 [756], at 9 ¶ 5.)  As part of that training, she has learned that the U.S. Postal Service's Express Mail Service is frequently used to transport controlled substances originating from areas throughout the United States, called "source areas," to the Atlanta area.  (Id.)  Moreover, express mail parcels found to contain narcotics are commonly addressed from an individual to an individual, and the return address on the label is often incomplete or fictitious.  (Id. at 9 ¶ 6.)

On August 1, 2008, while examining incoming Express Mail packages, destined for delivery in the metro-Atlanta area, USPI Wagner became suspicious of a parcel weighing approximately two pounds fourteen ounces that was shipped from Alax Black at 240 Taylor Street, San Francisco, California on July 31, 2008, and addressed for delivery on August 2, 2008, to Terry Rau at 3834 Wynntuck

12

Circle, Kennesaw, GA 30152.  (Def.'s Ex. 1 [756], at 9-10 ¶ 7; see also Gov't Ex. A [771-1], at 2.)

Upon further research of the parcel's return address, USPI Wagner learned that the zip code provided (94124) was incorrect, and that the correct zip code was 94102.  (Def.'s Ex. 1 [756], at 10 ¶ 8.)  She also researched the name "Alax Black" through a national database and was unable to associate that name with that address or any address in San Francisco.  (Id.) [6]  USPI Wagner also researched the name "Terry Rau" through a national address database and was unable to associate that name with an address in Kennesaw.  (Id. at 10 ¶ 9.) [7]

Given these suspicions, USPI Wagner avers that she met with Trained Narcotics Dog Handler Deputy B. Walker and his canine, Gunner, who conducted an exterior inspection of the Subject Parcel, which was included in a package

_____

[6] USPI Wagner added that persons who ship controlled substances via the mail often use incomplete return addresses in an attempt to disassociate themselves from the controlled substances.  (Def.'s Ex. 1 [756], at 10 ¶ 10.) Moreover, California is a source state.  (Id.)

[7] Defendant makes much of the fact that USPI Wagner's affidavit contains the following sentence fragment:  "Because the zip code for the delivery address was incorrect".  (Def.'s Perfected Mot. [756], at 2-3.)  She contends that the affiant's reliance on this fact was erroneous because the zip provided on the mailing label is associated with the Kennesaw address.  (Id.)  Assuming that contention was erroneous, as noted above, there were facts establishing probable cause other than the zip code reference.

13

lineup that included four dummy packages.  (Def.'s Ex. 1 [756], at 11 ¶ 11.)  The canine alerted to the Subject Parcel, indicating that it contained controlled substances or the residue of a controlled substance  (Id.)  Gunner did not alert to any of the other dummy packages.  (Id.)[8]

USPI Wagner maintained custody of the Subject Parcel.  (Def.'s Ex. 1 [756], at 11 ¶ 13.)  On August 4, 2008, USPI Wagner applied for a warrant (1:08-MJ-875) to search the Subject Parcel and provided Judge Baverman with the above-mentioned facts.  Judge Baverman determined that probable cause had been established and issued a warrant to search the Subject Parcel.[9]

This package was reasonably suspicious given its origin in a source area, the issues with the name and address of the sender, and the issues with the name and address of the recipient.  See Banks, 3 F.3d at 401 ("Reasonable suspicion results from specific and articulable facts and rational inferences therefrom that reasonably justify an intrusion.").  The package was properly delayed temporarily until a trained canine could sniff it for drugs.  Id.  The canine's alert provided

---

[8] USPI Wagner was familiar with the qualifications of the dog handler and his canine, and attached materials relating thereto to the warrant application.  (Def.'s Ex. 1 [756], at 11 ¶ 12 and Attachment A.)

[9] The Government represents that Subject Parcel was searched pursuant to the warrant and contained marijuana.

14

probable cause that drugs were inside.  See United States v. Dunkley, 911 F.2d 522, 527 (11th Cir. 1990) (per curiam) (probable cause arises when a drug-trained canine alerts to drugs).  "This is sufficient probable cause to obtain a search warrant."  Banks, 3 F.3d at 402.

In sum, given the governing standards (listed supra note 5), there was probable cause for Judge Baverman to sign search warrant 1:08-CV-875.  Under the facts contained in the search warrant affidavit, there was a fair probability that contraband or evidence of a crime would be found when the packages were searched.  But even if Judge Baverman erred, the Court has no difficulty in concluding that Ms. Rau has failed to show that the face of search warrant 1:08-MJ-875 was so devoid of probable cause that USPI Wagner's belief in its validity at the time it was issued was entirely unreasonable.  See Martin, 297 F.3d at 1313.  Thus, evidence seized pursuant to this search warrant should not be suppressed.

### 2. **1:08-MJ-1110**

In this application, USPI Wagner again provided a summary of her training and experience and noted that drug traffickers use international mail to transport controlled substances and that the name of the addressee is often fictitious and that the return address on the label is often incomplete or fictitious.  (Gov't Ex. B [771-1], at 8 ¶ 5-6.)

15

USPI Wagner avers that on or about June 17, 2008, Marietta/Cobb/Smyrna (MCS) Intelligence Agents began receiving information from a confidential source ("CS"), which was deemed to be accurate and reliable because the CS was in a position to know such information and much of the information had been corroborated by independent investigation, surveillance or other sources of information.  (Gov't Ex. B [771-1], at 9 ¶ 7.)  Additionally, the investigation determined that the CS was in a place where he could hear the conversations among the co-conspirators.  Information obtained from the CS revealed that defendant Bourassa controlled a criminal organization and his primary function was to direct, assist, and facilitate in the coordination of the sales and distribution of controlled substances within his criminal organization.  (Id.)

Surveillance and information revealed that Bourassa and Kimberly Mines had developed a criminal relationship with Morgan Blaine McIntosh, who in turn had developed a relationship with several pain management clinics to obtain prescriptions for controlled substances.  (Gov't Ex. B [771-1], at 9-10 ¶ 7.)  Information provided by the CS revealed that McIntosh had provided Bourassa with facility names, locations, contact numbers and methods of operation.  (Id. at 10 ¶ 7.)  Bourassa had provided this information to members of his criminal organization, so that he could utilize these pain management clinics as one source

of supply for controlled substances (specifically Oxycodone). Additional information obtained from the CS revealed that Bourassa had established and cultivated a criminal relationship with unidentified person(s) in Buenos Aires, Argentina, that were being used as a source of supply for the importation of controlled substances, specifically Alprazolarn (Xanax). (Id.)

Information provided by the CS revealed that Bourassa and his criminal associates established a network of residences and post office box rentals to receive these shipments of controlled substances through the U.S. Postal Service. (Gov't Ex. B [771-1], at 10 ¶ 7.) One of the associates identified was defendant Cheri Rau, Bourassa's mother. Information obtained by USPI Wagner showed that Ms. Rau opened a post office box in Hiram, Georgia, and is the owner and resident of 3834 Wyntuck [sic] Circle, Kennesaw, GA 30152.[10] (Id.)

Based on information that USPI Wagner obtained from the U.S. Customs and Border Protection, from March 27, 2008, through June 27, 2008, at least twenty package shipments from Buenos Aires, Argentina, destined for delivery to the primary residences (including 3834 Wyntuck [sic] Circle, Kennesaw GA) and

_____

[10] As already discussed, Ms. Rau claims to own and rent this property to others; she does not claim that she resides there.

post office box rentals being used by the subjects of this investigation had been seized and destroyed.   (Gov't Ex. B [771-1], at 10-11 ¶ 8.)   Intercepted communications revealed that Bourassa and his criminal associates, to include Rau and Darius Range, were familiar with the seizure process due to their receipt of Informed Compliance Notice for Imported Controlled Substances interdicted package letters sent by U.S. Customs and Border Protection.  (Id. at 11 ¶ 8.)

Based on information obtained from U.S. Customs and Border Protection, USPI Wagner stated that from July 14, 2008, through August 4, 2008, at least ten package shipments from Buenos Aires, Argentina, destined for delivery to the primary residences and post office box rentals being used by the subjects of the investigation had been seized.  (Gov't Ex. B [771-1], at 11 ¶ 9.)  These packages were packaged similarly to the "Subject Packages" described in her affidavit, i.e., in brown or white envelopes of similar size and bearing return addresses in Argentina.  (Id.)  On August 18, 2008, MCS Agent Schweizer took custody and control of these seized packages from U.S. Immigration and Customs Enforcement Special Agent D. Moody.  These packages contained 2,170 dosage units of a controlled substance, specifically Alprazolam (Xanax).  (Id.)

USPI Wagner further averred that information obtained from U.S. Customs and Border Protection showed that on September 4, 2008, an additional twenty-

18

five package shipments from Buenos Aires, Argentina, destined for delivery to the primary residences and post office box rentals being used by the subjects of this investigation, had been seized and destroyed.  (Gov't Ex. B [771-1], at 12 ¶ 10.)  Intercepted communications obtained throughout this investigation also revealed that these packages contained from 100 to 200 dosage units of a controlled substance, specifically Alprazolam (Xanax).  (<u>Id.</u>)  Continued surveillance and utilization of information obtained from the CS through September 10, 2008, revealed that members of the Bourassa organization continued to import, sell, and distribute quantities of Alprazolam (Xanax) and other controlled substances and/or collected money for the same.  (<u>Id.</u>)

USPI Wagner stated that on September 15, 2008, MCS Agents contacted her, stating that arrest warrants and search warrants had been issued for Bourassa and his associates.  (Gov't Ex. B [771-1], at 12 ¶ 11.)  She then contacted the post offices for each residence and requested that they hold all packages from Argentina addressed to these residences.  (<u>Id.</u>)

On September 22, 2008, USPI Wagner took custody of the Subject Packages from the Kennesaw Carrier Annex.  (Gov't Ex. B [771-1], at 12 ¶ 12.)  A check through the Accurint database showed that there was no Terrance Rau, Jay Rau, Josh Rau, or Sheryl Rau associated with 3834 Wyntuck [sic] Circle,

19

Kennesaw, GA, currently or ever.  (<u>Id.</u> at 12-13 ¶ 12.)  She further averred that Darius Ranger was a known associate of Bourassa and that he had his mail forwarded from a post office box in Hiram, GA, to 3834 Wyntuck [sic] Circle, Kennesaw, GA.  (<u>Id.</u> at 13 ¶ 12.)

USPI Wagner concluded by explaining to Judge Scofield that the Subject Packages had been maintained, unopened, in her custody in this District and were located at 200 Tradeport Blvd., Suite 209, Atlanta, Georgia, 30354, pending application for a search warrant.  (Gov't Ex. B [771-1], at 13 ¶ 13.)

Given the governing standards (listed <u>supra</u> note 5), there was probable cause for Judge Scofield to sign search warrant 1:08-MJ-1110.  Under the facts contained in the search warrant affidavit, there was a fair probability that contraband or evidence of a crime would be found when the packages were searched.  But, even if Judge Scofield erred, the Court has no difficulty in concluding that Ms. Rau has failed to show that the face of search warrant 1:08-MJ-1110 was so devoid of probable cause that USPI Wagner's belief in its validity at the time it was issued was entirely unreasonable.  <u>See</u> <u>Martin</u>, 297 F.3d at 1313.  Thus, evidence seized pursuant to this search warrant should not be suppressed.

### 3.    1:09-MJ-22

The language of this search warrant application is very similar to the one written to obtain search warrant 1:08-MJ-1110 and builds upon it.  After stating her background and discussing how persons use international mail to transport controlled substances, USPI Wagner informed the Magistrate Judge of the MCS investigation and of two new associates of the Bourassa criminal organization, Mark McCain and James May.  (Gov't Ex. E [771-1], at 40 ¶ 7.)  USPI Wagner stated that on August 26, 2008, McCain opened Post Office Box 830, Rockmart, Georgia under Mark McCain/South World Accounting as well as Post Office Box 829, Dallas, GA 30132 in the name of Mark McCain/Latin Care LLC.  (Id. at 40 ¶ 8.)  May opened Post Office Box 1840, Cartersville, GA 30120 in the name of James May/Marketing Solutions.  (Id.)  Bourassa's residence address was 2070 Stilesboro Dr., Kennesaw, GA 30152.  Bourassa's mother's address was 3834 Wyntuck [sic] Circle, Kennesaw, GA 30152.  Bourassa also opened a Post Office Box (No. 440095) in the name of Jeffrey Bourassa/J&C Auto Broker.  (Id.)

USPI Wagner repeated information from 1:08-MJ-1110 as she informed Judge Hagy that from March 27, 2008, through June 27, 2008, information obtained from the U.S. Customs and Border Protection showed that at least twenty package shipments from Buenos Aires, Argentina, destined for delivery to

21

the primary residences (including 3834 Wyntuck [sic] Circle, Kennesaw GA) and post office box rentals being used by the subjects of this investigation, had been seized and destroyed.  (Gov't Ex. E [771-1], at 40 ¶ 9.)  Moreover, based on information obtained from U.S. Customs and Border Protection, USPI Wagner stated that from July 14, 2008, through August 4, 2008, at least ten package shipments from Buenos Aires, Argentina, destined for delivery to the primary residences and post office box rentals being used by the subjects of the investigation had been seized.  (Gov't Ex. E [771-1], at 40 ¶ 10.)  These packages were packaged similarly to the "Subject Packages" referenced in the application, i.e., in brown or white envelopes of similar size, and bearing return addresses in Argentina.  (Id.)  On August 18, 2008, MCS Agent Schweizer took custody and control of these seized packages from U.S. Immigration and Customs Enforcement Special Agent D. Moody.  These packages contained 2,170 dosage units of a controlled substance, specifically Alprazolam (Xanax).  (Id.)

USPI Wagner further averred that information obtained from U.S. Customs and Border Protection showed that on September 4, 2008, an additional twenty-five package shipments from Buenos Aires, Argentina, destined for delivery to the primary residences and post office box rentals being used by the subjects of

this investigation, had been seized and destroyed.  (Gov't Ex. E [771-1], at 40-41 ¶ 11.)

USPI Wagner stated that on September 15, 2008, MCS Agents contacted her, stating that arrest warrants and search warrants had been issued for Bourassa and his associates.  (Gov't Ex. E [771-1], at 41 ¶ 12.)  She then contacted the post offices for each residence and requested that they hold all packages from Argentina addressed to these residences.  (Id.)

USPI Wagner also informed Judge Hagy about the search warrant she had obtained from Judge Scofield on September 26, 2008 (i.e., No. 1:08-MJ-1110), regarding seven similarly packaged packages from Argentina addressed to 3834 Wyntuck [sic] Circle, Kennesaw, Georgia, 30152, which is the address of Cheri Rau, Bourassa's mother.  (Gov't Ex. E [771-1], at 41 ¶ 13.)  USPI Wagner informed Judge Hagy that upon execution of that warrant, each envelope contained between 100 to 150 dosage units of alprazolam (Xanax).  (Id.)

USPI Wagner also informed Judge Hagy about the search warrant she had obtained on October 9, 2008, (i.e., No. 1:08-MJ-1155) for seven similarly packaged packages from Argentina addressed to the post office boxes located in Dallas, Rockmart, and Cartersville.  (Gov't Ex. E [771-1], at 41 ¶ 14.)  She

23

relayed to Judge Hagy that when she executed that warrant on October 10, each envelope contained between 100 to 150 dosage units of alprazolam (Xanax).  (Id.)

USPI Wagner averred that on December 1, 2008, she spoke to the post offices located in Rockmart, Kennesaw, and Dallas and learned that each post office was holding packages from Argentina which had arrived addressed to the above-listed post office boxes.  (Gov't Ex. E [771-1], at 41 ¶ 15.)  On December 4, 2008, USPI Wagner took custody of these packages.  (Id.)  Each of these packages had similar handwriting and postage as the previously seized packages.  (Id.)  She added that the packages had been maintained, unopened, in her custody and were located at 200 Tradeport Blvd., Atlanta, Georgia 30354, pending Application for Search Warrant.  (Gov't Ex. E [771-1], at 41 ¶ 16.)

Given the governing standards (listed supra note 5), there was probable cause for Judge Hagy to sign search warrant 1:09-MJ-22.[11]  Under the facts

_____

[11] The only challenge Ms. Rau makes to USPI Wagner's affidavit is that she relied in part on information from a confidential source and that she failed to establish his reliability.  (Def.'s Perfected Mot. [756] ¶ 11.)  That is not correct. USPI Wagner's affidavit avers as follows:

On June 17, 2008, Marietta/Cobb/Smyrna (MCS) Intelligence Agents began receiving information from a confidential source, hereafter referred to as a CS.  The information received from the CS was deemed to be accurate and reliable because the CS was in a

contained in the search warrant affidavit, there was a fair probability that contraband or evidence of a crime would be found when the packages were searched.  But, even if Judge Hagy erred, the Court has no difficulty in concluding that Ms. Rau has failed to show that the face of search warrant 1:09-MJ-22 was so devoid of probable cause that USPI Wagner's belief in its validity at the time it was issued was entirely unreasonable.  See Martin, 297 F.3d at 1313.  Thus, evidence seized pursuant to this search warrant should not be suppressed.

---

position to know such information and much of the information had been corroborated by independent investigation, surveillance and/or other sources of information.  Additionally, the investigation determined that the CS was in a place where they [sic] could hear the conversations among the coconspirators.

(Gov't Ex. E [771-1], at 39 ¶ 7.)  In any event, the CS was not the only source of information supporting probable cause.  Ms. Rau's argument thus "'ignore[s] the multitude of other facts contained in the affidavit[] that establish[es] probable cause for the issuances of the search warrant[].'"  United States v. Prather, No. 3:18-CR-00013-TCB-RGV, 2019 WL 3402037, at *7 (N.D. Ga. July 11, 2019) (quoting United States v. Green, 1:16cr131-WKW, 2018 WL 3451580, at *7 (M.D. Ala. Apr. 30, 2018), adopted by 2018 WL 3448224, at *1 (M.D. Ala. July 17, 2018); see also Green, 2018 WL 3451580, at *7 ("Even if the court were to disregard the information provided by the confidential informants, there are sufficient facts in the affidavits to support a finding of probable cause.").

III.   **CONCLUSION**

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant Cheri Lea Rau's Motions to Suppress Postal Search Evidence [741, 756] be **DENIED**.

**SO RECOMMENDED**, this 7th day of August, 2019.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

26