**FILED IN CHAMBERS**
**U.S.D.C. ROME**

Date: Sep 16 2020

JAMES N. HATTEN, Clerk

By: s/Kari Butler

Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION FILE |
| | NO. 4:18-CR-0003-MLB-WEJ-03 |
| CHERI LEA RAU, | |
| Defendant. | |

## NON-FINAL REPORT AND RECOMMENDATION ON DEFENDANT RAU'S MOTIONS TO SUPPRESS CELL PHONE EVIDENCE [739, 757]

Defendant Cheri Lea Rau filed a Motion to Suppress Cell Phone Evidence [739], which she subsequently perfected [757]. The undersigned conducted hearings on these Motions on January 7, 2020 [894] and January 16, 2020 [900], which have been transcribed (Tr. Vol. 1 [914], pp. 1-16 and Tr. Vol. 2 [915], pp. 17-48, respectively).[1] The parties have briefed the issues raised, making these Motions ripe for decision. (See Def.'s Post-Hr'g Br. [1006]; Gov't Resp. [1017].)

---

[1] The page numbers in Volume 2 begin where the pages numbers in Volume 1 end. Because the pages of the Transcript are consecutively numbered, the Court cites only page numbers and not Volume numbers.

For the reasons explained below, the undersigned **RECOMMENDS** that Defendant Rau's Motions [739, 757] be **DENIED**.

## I.    STATEMENT OF FACTS

On February 12, 2018, the undersigned issued an arrest warrant [27] for Defendant following the grand jury's return of an Indictment [1] against her four days earlier.  The Indictment charges Ms. Rau and several others with federal crimes based on their alleged activities as members or associates of a criminal enterprise known as the Ghostface Gangsters ("GFG").  Count I charges Defendant with RICO conspiracy; Count 2 charges her with conspiracy to distribute and possess with the intent to distribute a controlled substance.[2]

On March 6, 2018, agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), assisted by members of the Cobb County Police Department, travelled to Defendant's home in Kennesaw, Georgia to execute that arrest warrant, arriving at approximately 7:00 a.m.  (Tr. 5-6, 20; see also ATF Rpt. of Invest. [1017-1].)  A body camera worn by a Cobb County Police Officer captured Defendant's arrest.  (Tr. 6-7, 21-22, 25.)  Video from that body camera

---

[2] On August 22, 2018, the grand jury returned a Superseding Indictment [279] that did not alter the charges against Defendant.

was played in open court and is in the record.  (See Gov't Ex. 1 [901] (DVD).)

The testimony of the agents about events occurring at Defendant's arrest matches

what is seen on the video.

Specifically, the video shows agents and officers approach Defendant's

front door.  ATF Agent Monty Sharitt knocked and announced, "Police."  (Gov't

Ex. 1 at 07:02:44-46; see also Tr. 22, 25-26.)  At 07:05:16, after putting her dog

away, Defendant answered the door.   Agent Sharitt introduced himself and

informed Defendant that he had a warrant for her arrest.   (Gov't Ex. 1 at

07:05:25.)  Defendant's cell phone is visible in her hand.  (Id. at 07:05:25-26; see

also Tr. 28.)  During this initial encounter, Defendant asked to make telephone

calls to arrange for someone to care for her dog.  Agents informed Ms. Rau that

she could make all the calls she wanted in the vehicle on the way to the Rome.

She also asked if she could walk her dog, but one of the agents offered to and

performed that task for her.  (Gov't Ex. 1 at 07:06:11-50.)[3]

---

[3] At 07:06:28-30, Ms. Rau placed her cell phone on a table to her right of
the front door (the agent's left) and picked up the dog's leash, which she later
passed to an agent.  (See also Tr. 29.)  Shortly thereafter, because Ms. Rau had
indicated that she wanted to make some calls, Agent Sharitt picked up the cell
phone to make sure it went with her to Rome and handed it to ATF Agent Daniel
Arrugueta, who was outside on the front steps.  (Id. at 7, 29, 36.)

The video shows that Defendant moved away from the door to get ready to leave with the agents, engaging in tasks like turning off her computer, putting on her shoes, changing her shirt, and brushing her teeth. (Gov't Ex. 1 at 07:07:45 through 07:12:52.) Beginning at 07:13:51, Agent Sharitt informed Defendant that officers outside have the cell phone she had left by the door so that she could call someone to come take care of her dog or call whomever she wanted. (See also Tr. 30.) At 07:14:53, Agent Arrugueta handed Ms. Rau's cell phone to her. (See also Tr. 7-8, 29.)[4] The video reflects Defendant making calls on it. (Gov't Ex. 1 at 07:15:00 through 07:19:51; see also Tr. 31.) At one point, Ms. Rau handed her cell phone to Agent Sharitt to speak with someone about what was happening. (Gov't Ex. 1 at 07:19:52; see also Tr. 31.)

Agent Sharitt returned Defendant's cell phone to her at 07:21:39 and attempted another call. With rain beginning to fall harder, Agent Arrugueta suggested to Ms. Rau that they needed to leave for Rome. (Gov't Ex. 1 at 07:22:07-09.) As Defendant started to make another call, Agent Sharitt suggested

---

[4] Agent Arrugueta testified that the cell phone had not yet been seized; had it been seized, an agent would have placed it in evidence and created a chain of custody. At that point, the cell phone could not have gone back to its owner. (Tr. 8.) Agent Sharitt echoed that testimony, stating that the cell phone was not seized at Defendant's home. (Id. at 36.)

that she do so en route in the vehicle.   (Id. at 07:22:12; see also Tr. 31.)

Defendant asked how she would be able to make a call if she were cuffed and was

told that she would be cuffed in the front.  (Gov' Ex. 1 at 07:22:14-18; see also Tr.

31.)   Beginning at 07:22:30, agents placed handcuffs on Defendant with her

hands in the front, momentarily taking her cell phone in order to do so.  (See also

Tr. 31, 33, 38-39.)  At 07:23:54, an agent returned Defendant's cell phone to her.

(See also Tr. 31-32, 39.)  Agents placed defendant in a vehicle at about 07:24:41.

ATF Agents Sarah Thomas and Stephen Kirkpatrick transported Defendant

to Rome.  (Tr. 32, 38.)  Ms. Rau had her cell phone with her in the agents' vehicle.

(Id. at 39.)  Agent Thomas had placed a camera in the vehicle which captured Ms.

Rau's use of the cell phone while en route.  (Id. at 39-41.)  A video retrieved from

that camera is in evidence and was played in open court.  (Id. at 40-41; see also

Gov't Ex. 2 (jump drive).)

The video shows that Agent Kirkpatrick was driving, Ms. Rau was the

front seat passenger, and Agent Thomas was in the back seat.  (See, e.g., Gov't

Ex. 2, at 07:25:44; see also Tr. 41-42.)  At 7:23:27 (and at other time stamps, i.e.,

07:53:58 and 07:57:00), Defendant is seen holding her cell phone and heard using

it; at one point she tells the person on the other end of the call that the agents are

allowing her to call anyone she wants.  (See also Tr. 42.)

5

Beginning at 08:01:44, Agent Thomas advised Defendant that the case agent asked her to seize Defendant's cell phone and place it in airplane mode (which she eventually did).  Agent Thomas asked Ms. Rau if there were any contacts that she wanted out of the phone before she did so.  (Gov't Ex. 2 at 08:02:18; see also Tr. 43.)  By 08:03:44, Agent Thomas had the cell phone and it was not returned to Defendant.  (See also Tr. 43.)  Agent Kirkpatrick testified that the cell phone was seized for evidentiary purposes.  (Id. at 44.)  Defendant did not provide consent for agents to seize it.  (Id.)

After review of an Application and Affidavit for Search Warrant (see Gov't Attach. 2 [1017-2], at 1-15), the undersigned determined that the Government's application showed probable cause for a search of Ms. Rau's cell phone and issued a search warrant.  (Id. at 16-19.)  The Government's March 27, 2018 application noted, inter alia, that the cell phone had been recovered from Ms. Rau incident to her arrest on March 6, 2018 pursuant to a federal arrest warrant.  (Id. at 2.)

## II.    ANALYSIS

Defendant seeks to suppress any evidence recovered from her cell phone. She contends that because Agent Sharitt effectively seized her cell phone before her arrest, its seizure was not incident to her arrest and thus illegal.  (Def.'s Post-

6

Hr'g Br. 2-5.)  Second, Ms. Rau argues that there was no probable cause for the issuance of the search warrant for her cell phone.  (Def.'s Mot. to Supp. [757] 3-4.)  The Government rebuts these arguments.  (Gov't Resp. [1017].)

### A.    <u>Seizure of Defendant's Cell Phone</u>

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. Amend. IV.  As Defendant correctly points out, a "warrantless search is per se unreasonable under the Fourth Amendment unless it falls within one of several specifically established and well-delineated exceptions," such as a search incident to arrest.  (Def.'s Post-Hr'g Br. 3, citing, <u>inter alia</u>, <u>Chimel v. California</u>, 395 U.S. 752 (1969).)  However, Ms. Rau's cell phone was not searched incident to her lawful arrest—it was seized.  <u>See</u> <u>Horton v. California</u>, 496 U.S. 128, 133 (1990) ("The right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and seizures.  A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property.").  A search of her cell phone occurred later pursuant to a warrant.  (<u>See</u> <u>infra</u> Part II. B.)

Defendant does not challenge the legality of her arrest pursuant to a warrant. The issue then is whether agents could seize Ms. Rau's cell phone incident to her lawful arrest. The law is clear that they could. See Riley v. California, 573 U.S. 373, 388 (2014) ("Both [defendants] concede that officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant. That is a sensible concession."); United States v. Reilly, No. 1:14-CR-146-ODE-GGB, 2015 WL 4429415, at *12 (N.D. Ga. July 20, 2015) ("[Defendant] was lawfully arrested, and agents are permitted to seize cell phones pursuant to a lawful arrest").

Defendant's argument that the seizure of her cell phone was unlawful because it occurred before her arrest is belied by the video evidence. Ms. Rau had her cell phone in her hand when she opened the door; she put it down by the door on a table when agents entered her dwelling; Agent Sharitt picked up the cell phone to make sure that Defendant did not forget it, and then handed it to Agent Arrugueta, who gave it to Defendant when she came outside. Even after agents cuffed Ms. Rau, thus making her arrest "official," she retained her cell phone. Indeed, the record shows that Ms. Rau possessed and used her cell phone from the time of her first encounter with police at about 7:00 a.m. until it was seized at about 8:03 a.m. by Agent Thomas while they were in the vehicle en route to

8

Rome.   Therefore, the Court reports that Defendant's contention that agents effectively seized her cell phone inside her home nine minutes before arresting her and placing her in handcuffs outside her home is not supported by the record.[5]

Upon her arrest, Ms. Rau had an item of evidentiary value on her person— a cell phone.   Cell phones, complete with memory of numbers recently or frequently called, are a "known tool of the drug trade."   See United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990).   Moreover, "it is common for gang members to maintain contact with other members via cell phone and maintain photographs, notes, and calendars that document gang activity; it is also common for cell phones to contain contact information of other individuals associated with the gang."   United States v. Mobely, No. 1:16-CR-145-TWT-JKL-6, 2017 WL

_____

[5] Even if agents had seized Defendant's cell phone before arresting her, it would make no difference, because any seizure would have been incident to a virtually contemporaneous lawful arrest.   See United States v. Rowe, No. 2:18-CR-123-WKW, 2018 WL 3448483, at *4 (M.D. Ala. June 20, 2018), R&R adopted, 2018 WL 3448225 (M.D. Ala. July 17, 2018) ("while Sergeant Dunn took Rowe's cell phone from him before arresting him for safety reasons, this seizure was incident to Rowe's arrest because it is not 'particularly important that the search precede[s] the arrest rather than vice versa' when a formal arrest occurs shortly after the search and seizure") (quoting Rawlings v. Kentucky, 448 U.S. 98, 111 (1980)).

10574358, at *9 (N.D. Ga. Oct. 26, 2017), <u>R&R adopted sub nom.</u> <u>United States</u> <u>v. Mobley</u>, 2018 WL 5077755 (N.D. Ga. Oct. 18, 2018).

Ms. Rau is charged in a drug conspiracy with gang members, one of whom is her son. It was probable that her cell phone contained evidence of the alleged drug conspiracy and gang activity. Thus, her cell phone could be seized from her person for evidentiary purposes. <u>See</u> <u>Carroll v. United States</u>, 267 U.S. 132, 158 (1925) ("When a man is legally arrested for an offense, whatever is found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution."); <u>United States v. Ortiz</u>, 84 F.3d 977, 982-84 (7th Cir. 1996) (officers making valid arrest were authorized to seize a suspected heroin supplier's pager containing an electronic telephone directory in order to prevent destruction of potential evidence).

Typically, a seizure of property from an arrestee's person occurs contemporaneously with her arrest. However, the law does not mandate an immediate seizure. In <u>United States v. Edwards</u>, 415 U.S. 800 (1974), the Supreme Court held that "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." <u>Id.</u> at 803. According to the Court, the delay there in seizing

10

evidence was reasonable because the defendant was "no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention." Id. at 805; see also Abel v. United States, 362 U.S. 217, 239 (1960) (searches and seizures that could have been made at the moment of arrest may legally be conducted later when the accused arrives at the place of detention).

The agents could have seized Ms. Rau's cell phone at the time of her arrest. The approximately one-hour delay in seizing Defendant's cell phone is immaterial. Defendant benefitted from the agents' decision not to seize the cell phone at the time of her arrest, because she was able to continue using it to contact friends or family while en route to her initial appearance and arraignment in Rome.

In sum, because the agent's seizure of Defendant's cell phone while she was being transported to the Rome Courthouse for initial her appearance and arraignment was incident to a valid arrest, agents acted lawfully. See United States v. Robinson, No. 1:05-CR-477-13-CC, 2007 WL 9725266, at *1 (N.D. Ga. Jan. 26, 2007) ("cell phone was lawfully seized incident to Defendant's arrest"). Therefore, Defendant's Motion to Suppress any evidence obtained from her cell phone on the basis that it was illegally seized should be **DENIED**.

11

**B.** **Search Warrant for Defendant's Cell Phone**

Although agents seized Ms. Rau's cell phone on the day of her arrest, they did not search it until after obtaining a warrant from the undersigned. See United States v. Gadd, No. 1:14-CR-291-8-SCJ-JSA, 2016 WL 11628076, at *5 (N.D. Ga. Feb. 19, 2016) ("when the police seize a cellular phone incident-to-arrest, they must obtain a warrant before searching the electronic contents"). Ms. Rau argues that the agent's Affidavit in support of that search warrant lacked probable cause because the illegal conduct alleged therein was stale.[6]

**1.** **Probable Cause**

"The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984). Probable cause is not a

---

[6] Ms. Rau's perfected Motion mentions that the Government waited 21 days after the seizure of her cell phone to apply for a search warrant. (See Def.'s Mot. [757] ¶ 12.) However, Ms. Rau neither questioned Government witnesses about this delay at the hearing nor addressed it in her post-Hearing Brief. Thus, the Court deems any argument about that delay abandoned. Even if Ms. Rau had preserved this argument, it is without merit. See Thomas v. United States, 775 F. App'x 477, 492 (11th Cir. 2019) (per curiam) (33-day delay in obtaining a search warrant was reasonable); United States v. Laist, 702 F.3d 608, 616 (11th Cir. 2012) (25-day delay in obtaining a search warrant was reasonable).

high bar and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Paez v. Mulvey, 915 F.3d 1276, 1286 (11th Cir. 2019) (internal quotation marks and citation omitted).

In considering an application for a search warrant, the judicial officer's task is to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place. Illinois v. Gates, 462 U.S. 213, 238 (1983). "A search warrant is supported by probable cause if the supporting affidavit establishes 'a connection between the defendant and the location to be searched; . . . a link between the location and criminal activity; and . . . the informant's veracity and basis of knowledge.'" United States v. Joseph, 709 F.3d 1082, 1099 (11th Cir. 2013) (alterations in original) (quoting United States v. Davis, 313 F.3d 1300, 1303 (11th Cir. 2002)).

A reviewing court examining a challenge to a search warrant applies a different standard, under which it accords "'great deference' to the determination of a magistrate judge that a search warrant affidavit is supported by probable cause, and [must] uphold the determination of the magistrate judge so long as he 'had a substantial basis for concluding that a search would uncover evidence of wrongdoing.'" Joseph, 709 F.3d at 1093 (quoting Gates, 462 U.S. at 236); see

13

also Massachusetts v. Upton, 466 U.S. 727, 728 (1984) (per curiam ) ("[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant."); United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994) ("[R]eviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.").  When a search is conducted pursuant to a warrant, the defendant bears the burden to show that the warrant is invalid.  United States v. Lockett, 533 F. App'x 957, 965 (11th Cir. 2013) (per curiam).

       With regard to claims of staleness, "information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues."  United States v. Bervaldi, 226 F.3d 1256, 1264 (11th Cir. 2000).  "There is no particular rule or time limit for when information becomes stale."  Id.  In addition to (1) the length of time, courts consider the (2) nature of the suspected crime (discrete crimes or ongoing conspiracy), (3) the habits of the accused, (4) the character of the items sought, and (5) the nature and function of the premises to be searched.  United States v. Acosta, 807 F. Supp. 2d

1154, 1227 (N.D. Ga. 2011).[7]  With regard to the five factors identified in <u>Acosta</u>, the undersigned reports as follows.

### a)   Length of Time

Although Defendant is correct that the Affidavit contains information as far back as 2004, she neglects to note that it also describes her nearly two-decade participation in the alleged RICO drug conspiracies.  In addition to facts related to Defendant's and other coconspirators' 2004-2005 attempt to persuade a victim of a shooting to not testify against her son, co-defendant Jeffrey Bourassa, the Affidavit detailed Ms. Rau's participation in drug activity in 2008.  (Appl. & Aff. [1017-2] 8-9.)   Furthermore, the Affidavit explained that in 2015 and 2017, Defendant continued to engage in activities related to the crimes for which she is

---

[7] The court in <u>Bastida v. Henderson</u>, 487 F.2d 860 (5th Cir. 1973), explained as follows:

> In general, the basic criterion as to the duration of probable cause is the inherent nature of the crime.  The Circuits hold that where an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time.  On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance.

<u>Id.</u> at 864 (<u>Bastida</u> is binding precedent per <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981) (en banc)).

charged.  In 2015, she sent a letter to her son indicating another GFG member's willingness to cooperate against him and mailing GFG literature to her son while he was incarcerated.  (Id. at 9.)  On December 24, 2017, Defendant advised a confidential informant ("CI") that she was in contact with an incarcerated former GFG statewide coordinator and communicated with him via the Georgia Department of Corrections' inmate email service.  (Id. at 9-10.)  She also divulged to a CI that she used Facebook to post information from her son, a co-founder of GFG, on his Facebook page.  (Id.)

Additionally, on January 29, 2018, less than three months before the Government sought the search warrant, agents learned from the Georgia Department of Corrections that Defendant had, in fact, been communicating with 31 prison inmates via email.  (Appl. & Aff. 10.)  Ten of the 31 inmates with whom she was communicating were members of GFG.  (Id.)

Finally, after Defendant's arrest on March 6, 2018, agents received additional information from a cooperator regarding Defendant.  (Appl. & Aff. 10.)[8]  The cooperator, an associate of GFG, informed agents that Defendant had

---

[8] In the Affidavit, the date the cooperator contacted law enforcement with this information is erroneously listed as March 7, 2013.  Given that the cooperator

16

contacted the cooperator from Defendant's sister's phone and advised the cooperator not to contact her on her seized cellphone. Defendant told the cooperator to dispose of her old cell phone number and that she would provide the cooperator with a number to a "throw away" phone. (Id.) The Government argues, and the Court agrees, that this fact demonstrated that Ms. Rau had likely used the subject cell phone to communicate with other gang associates.

Although the length of time between the dates of incriminating acts attributed to Defendant and the search of the cell phone can be dated back to 2004, the search warrant Application and Affidavit also contained far more recent allegations of criminal activity which weigh against Defendant's staleness contention.

### b)    Nature of the Suspected Crime

The crimes with which Defendant have been charged are not one-time offenses. Instead, Count One, the RICO conspiracy, is alleged to have begun from at least 2000 and continued up to and including the date of the Indictment. Count Two, the drug conspiracy, is alleged to have begun on or about March 22,

---

was recounting an interaction he/she had with Defendant on the afternoon of her arrest on March 6, 2018, this is an obvious typographical error.

2002 and continued through the date of the Indictment. The criminal activity alleged against Defendant and her co-conspirators went on for nearly two decades. They are not discrete crimes in either time or conduct. There are over 100 overt acts alleged in the Superseding Indictment. (See Supr. Indict. [279] 12-30.) Defendant is specifically named in seven overt acts with a date range of 2004-2015. (Id. at 13-18.) The nature of these charges demonstrate that the Government must gather and rely on evidence of continuous and long-standing conduct between the Defendant and other co-conspirators to establish prima facie cases for the two charged conspiracies. Thus, the nature of the charges mitigates against a finding of staleness.

### c)   The Habits of the Accused

According to the Affidavit, Defendant's habits also mitigate against a finding of staleness. She used electronic platforms to communicate with associates of the GFG enterprise and carry out requests from GFG members. (Appl. & Aff. 8-10.) She communicated with inmates in the Georgia Department of Corrections via email, ten of whom were certified GFG members. (Id. at 9.) Jeffrey Bourassa, her son, co-defendant, and founding member of GFG, also instructed Defendant to post on his Facebook page. (Id. at 9-10.) Ms. Rau also

18

used her cell phone to communicate with GFG associates as evidenced by her call to a cooperating GFG associate the day after her arrest.  (Id. at 10-11.)

### d)      Character, Nature and Function of a Cell Phone

The affiant, SA Nelson A. Medina, who received training in the types of information stored on cell phones and computers, described the characteristics and functions that allow cell phones to be used to conduct and further criminal activities.  (Appl. & Aff. 3-7.)  SA Medina explained that smart phones, like personal computers, contain software applications or "apps" that perform specific functions and save data associated with those functions.  (Id. at 3-4.)  Those functions include accessing the internet, sending and receiving email, taking photographs, and participating in internet social networks.  (Id. at 4.)  Moreover, SA Medina referenced within the Affidavit his observation of the use of social media networking websites like Facebook and Instagram as a communication tool between street gangs and drug trafficking organizations.  (Id. at 7.)  He also noted that such websites could be installed on mobile electronic devices and laptop computers.  (Id.)  Additionally, SA Medina detailed that, based on his training and experience, cell phones can be used to take photographs of illicit drugs, contain contact information for other co-conspirators, and provide a variety of mechanisms to conduct licit and illicit business.  (Id. at 6-7.)

19

SA Medina further explained that electronic devices can store information for long periods of time. (Appl. & Aff. 5.) A variety of file types, including text messages, emails, photographs, and videos, can be stored on cellphones. (Id. at 4.) Based on his training and experience, SA Medina noted that internet search history is an example of a function of smart phones that could be stored for a long period of time. (Id. at 5.)

The Affidavit makes clear that Defendant was using her cell phone to communicate with GFG associates and carry out orders from her son, a GFG founder and member. Because a myriad of information may be stored on cellphones for untold periods of time, there is a reasonable probability that information related to Defendant's alleged criminal activity could yet be found after an extended period of time between the receipt of inculpatory information and the procurement of a search warrant for the device. Therefore, the character, nature, and function of a cellphone weigh against a finding of staleness.

In sum, the undersigned reports that probable cause existed for the issuance of the Search Warrant here, and that the information in the supporting Affidavit was not stale. Therefore, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress the evidence located in the search of her cell phone be **DENIED**.

## 2.   <u>Good Faith Exception</u>

Even if the search warrant had lacked probable cause, the Government contends that the Motion to Suppress should still be denied because the agent relied in good faith on it. (Gov't Resp. 13-17.) The Court agrees. Under <u>United States v. Leon</u>, 468 U.S. 897 (1984), the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in objectively reasonable reliance on the warrant and the warrant was issued by a detached and neutral magistrate. <u>Id.</u> at 919-22. <u>See also</u> <u>United States v. Robinson</u>, 336 F.3d 1293, 1295-96 (11th Cir. 2003) (<u>Leon</u> "stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause").

There are four situations in which the <u>Leon</u> good-faith exception does not apply and suppression is warranted:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in <u>Lo-Ji Sales, Inc. v. New York</u>, 442 U.S. 319, 99 S. Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the

21

place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (citation and internal marks omitted).

None of the circumstances precluding application of the good faith exception exist here, as there is no allegation that false information was included in the Affidavit (see Appl. & Aff. [1017-2] 1-11), and there is nothing in the record suggesting that the undersigned magistrate judge (who reviewed the Affidavit and signed the search warrant) engaged in any misconduct or abrogation of judicial responsibility. Further, as already discussed, the Affidavit set forth sufficient probable cause, and in any event, is not "so lacking . . . as to render official belief in its existence entirely unreasonable." Martin, 297 F.3d at 1313 (citation and internal marks omitted). Moreover, the warrant is facially valid in that it describes in sufficient detail the cell phone to be searched (i.e., an Apple iPhone, model A1905, IMEI No. 356763084582736), lists the items to be seized (see Search Warrant [1017-2] 14-15), and is signed by the undersigned magistrate judge. See United States v. Travers, 233 F.3d 1327, 1330 (11th Cir. 2000) (finding warrant "was not 'so facially deficient—i.e., failing to particularize the

22

place to be searched or the things to be seized—that the executing officers could not have reasonably presumed it to be valid'") (citation omitted).

Accordingly, the agent executing the warrant (SA Medina) was justified in believing in its validity, and evidence seized during the execution of the cell phone warrant would not be subject to suppression under the good faith exception even if the warrant was found to lack probable cause.  See United States v. Kent, No. 4:17-CR-00039-06-JPB, 2020 WL 2786791, at *2 (N.D. Ga. May 29, 2020) ("Even if the warrant was not supported by probable cause or was somehow too broad or otherwise invalid, this Court agrees with the Magistrate Judge that under the good faith exception, suppression is not warranted here.").

## III.   CONCLUSION

For the reasons explained above, the undersigned **RECOMMENDS** that Defendant Cheri Lea Rau's Motions to Suppress Cell Phone Evidence [739, 757] be **DENIED**.

**SO RECOMMENDED**, this 16th day of September, 2020.

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE