## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

United States of America,

v.                                    Case No. 4:18-cr-3-MLB-3

Cheri Lea Rau,

             Defendant.

_____/

## OPINION & ORDER

Magistrate Judge Walter E. Johnson recommends denial of Defendant Cheri Rau's motion to suppress cell phone evidence (Dkts. 739; 757). (Dkt. 1033.) Defendant Rau objects to that recommendation. (Dkt. 1071.) The Court overrules her objections, adopts the Magistrate Judge's recommendation, and denies Defendant Rau's motions to suppress.

## I.   Background

In February 2018, a federal grand jury indicted Defendant Rau, her son (Jeffrey Bourassa), and members of the so-called Ghost Face Gang on various federal crimes. The charges generally allege that Defendant Rau conspired with members of the gang (including her son) to possess and distribute controlled substances. On February 12, 2018, federal and state

law enforcement officers went to Defendant Rau's home to arrest her. A Cobb County Police Officer wore a body camera on that day, thus providing video evidence of the relevant events. (Dkt. 901-1.) Officers also testified about her arrest at a hearing before Magistrate Judge Johnson. (Dkts. 915; 916.) Having reviewed the body camera footage and hearing transcripts (and in the absence of any objection by Defendant Rau), the Court adopts Magistrate Judge Johnson's detailed recitation of the facts surrounding Defendant Rau's arrest and the seizure of her phone. (Dkt. 1003 at 2–6.)

The Court discusses the facts in more detail below. But, generally, the evidence shows Defendant Rau was holding her cell phone when agents knocked on her door but placed it on a table inside her home shortly thereafter. She repeatedly asked to use her phone to find someone to care for her dog. Agents assured her she could do so. As she was getting dressed, Special Agent Monty Sharitt picked the phone up from inside Defendant Rau's home and took it outside. When Defendant Rau came outside, he gave her the phone, saying she could make the calls she needed. Defendant Rau made several calls before agents handcuffed her and placed her in their car.

Two other agents transported Defendant Rau to the courthouse. A recording from the car also exists and was introduced during the suppression hearing. (Dkt. 901-2.) It shows that Defendant Rau made at least one call from the car. Eventually, one of the agents told her they were going to seize her phone, and they did so. Agents took the phone about an hour after they first knocked on her door. They later obtained a search warrant for it.

Defendant Rau moved to suppress the search and seizure of her phone. She argued Agent Sharitt seized the phone prior to her arrest when he took it out of the house. (Dkt. 757 at 2.) She also argued the search warrant for the phone relied on stale information and lacked probable cause. (Dkt. 739 at 2–3.) After conducting a hearing and allowing subsequent briefing, Magistrate Judge Johnson issued a Report and Recommendation ("R&R") saying Defendant Rau's motion should be denied. (Dkt. 1033.) He concluded the agents lawfully seized her phone during the course of placing her under arrest and that the subsequent warrant was supported by sufficient probable cause. Defendant Rau filed objections. (Dkt. 1071.)

## II.  Legal Standard

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's R&R.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59; *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam). A district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).  The district judge should "give fresh consideration to those issues to which specific objection has been made by a party." *Jeffrey S. v. State Bd. of Educ. of Ga.*, 896 F.2d 507, 512 (11th Cir. 1990) (citation omitted).  For those findings and recommendations to which a party has not asserted objections, the court must conduct a plain error review of the record.  *See United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983).

Parties filing objections to a magistrate judge's R&R must specifically identify those findings to which they object.  *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988).  "Frivolous, conclusive, or general objections need not be considered by the district court." *Id*. Defendant Rau's objections generally adopted her post-evidentiary

hearing brief in support of her motion to suppress—that is, her claim the officers seized her phone prior to her arrest when they removed it from her home.  (Dkt. 1071 at 3, adopting Dkt. 1006.)  She filed no specific findings as to the Magistrate Judge's determination regarding the adequacy of the search warrant.  The Court thus conducts a de novo review of the former issue and a plain error review of the latter.  *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1373 (N.D. Ga. 2006) ("[I]ssues upon which no specific objections are raised do not so require de novo review; the district court may therefore 'accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge[,]' applying a clearly erroneous standard." (quoting 28 U.S.C. § 636(b)(1))).

## III.   Discussion

### A.   Seizure of the Phone

The Fourth Amendment protects the public from "unreasonable searches and seizures."  U.S. Const. amend. IV.  "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."  *United States v. Jacobsen,* 466 U.S. 109, 113 (1984).  "A

'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id.*

Recognizing the Fourth Amendment's rather vague standard for lawfulness, the Supreme Court has announced various rules and presumptions designed to balance the need of law enforcement against an individual's privacy interests—that is, to define what is "reasonable" and what is "unreasonable." In the "ordinary case a seizure of personal property is *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United State v. Place,* 462 U.S. 696, 701 (1983). On the other hand, the Supreme Court has announced several exceptions to the warrant requirement, finding warrantless searches and/or seizures reasonable in exigent circumstances, when they impose only minimal intrusion, or when faced with special law enforcement needs. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 27 (1968) (temporary stop and limited search for weapons based on reasonable suspicion); *Minnesota v. Olson*, 495 U.S. 91, 100 (1990) ("[A] warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence. . . ."); *United States*

*v. Newsome*, 475 F.3d 1221, 1226 (11th Cir. 2007) ("[T]he warrantless seizure of a gun is 'objectively reasonable' under the Fourth Amendment when there is a real concern for the safety of the officers present or the public at large."). As part of this, law enforcement officers are entitled to seize items of evidence—including cell phones—from a defendant incident to a lawful arrest in order to prevent the destruction of evidence. *See Riley v. California*, 573 U.S. 373, 388 (2014) ("Both [defendants] concede that officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant. That is a sensible concession."); *United States v. Riley*, No. 14-cr-146-ODE, 2015 WL 4429415 at *12 (N.D. Ga. July 20, 2015) ("[Defendant] was lawfully arrested and agents are permitted to seize cell phones pursuant to a lawful arrest.").

The Magistrate Judge concluded that, since Defendant Rau was charged with a drug trafficking crime and since law enforcement knew drug traffickers often use cell phones to communicate with one another, it was reasonable for agents to seize Defendant Rau's phone incident to her arrest in order to prevent the destruction of any evidence contained on it. (Dkt. 1003 at 9-10.) He further concluded that it did not really

7

matter whether they seized the phone immediately before or immediately after her actual arrest, as either seizure would still be incident to the arrest. (*Id.*) Defendant Rau agrees that a seizure incident to an arrest is lawful. But she says that is irrelevant. She argues the agents seized the phone—not in the car after arresting her—but rather from her home after she placed it on the table. She says that, once she put it down and began dressing, Agent Sharitt had no right to pick it up and remove it from her home. She says the seizure was not incident to her arrest as she did not have the phone on her once she put it down.

The Court agrees law enforcement could not seize Defendant Rau's cell phone and remove it from her home simply to give it back to her for the purpose of effectuating its subsequent seizure incident to arrest. Such a ruse would almost certainly make a subsequent seizure unreasonable. But, that is not what happened here. The agents did not seize the phone from her home. Agent Sharitt picked up Ms. Rau's phone after she said she needed to make phone calls to arrange for the care of her dog. He did it as a courtesy to her. His actions did not interfere with her possessory interests in the phone as he gave it back to her shortly

thereafter.  Agents seized it some time after as they were driving to the courthouse.

As the context is important, the Court reviews the events at issue in more detail.  When agents first arrived at the house, they told Ms. Rau they were there to arrest her and asked whether she had shoes and socks to wear.  (Dkt. 901-1 at 7:05:16.)  Ms. Rau, who was holding her phone at the time, immediately asked if she could make a "quick phone call."  (*Id.* at 7:05:45.)  When Agent Sharitt said "not now," she interjected that she needed to call someone to come and get her dog, clearly worried about leaving the animal alone in the house.  (*Id.* at 7:05:45–49.)  The agent then explained he would allow her to make phone calls from the car while in route to the courthouse.  (*Id.*)  As another agent told her to leave her jewelry and personal belongings behind, Defendant Rau explained that— before she could go with them—she needed to walk her dog and call someone to come look after the dog. (*Id.* at 7:05:20–7:06:20.) That agent then explained that she could make "all the calls she want[ed] to" from the car.  (*Id.*)  Defendant Rau interrupted to ask if she could walk her dog.  (*Id.*)  Agent Sharitt said he would allow her to do so but would have

to accompany her.  Another agent then offered to take the dog for a walk while Defendant Rau got ready.  (*Id.* at 7:06:30.)

At that point, Defendant Rau walked back into her home to get her dog and put him on a leash.  She put her phone down while doing that. (Dkt. 916 at 14.)  After one agent took the dog outside, another agent asked Defendant Rau to get ready to go, suggesting she put on shoes and leave all jewelry behind.  (Dkt. 901-1 at 7:07:40.)  The agents then let her move about her house freely to change her clothes and get ready to leave with them.  (*Id.* at 7:08:00–7:14:18.)  They did not monitor her activity, only calling out twice to check on her when she was alone in her bedroom with the door closed.  (*Id.*)

During this time, Agent Sharitt picked up the phone and handed it to Agent Arrugueta (who was outside of the house) to make sure Ms. Rau had it to call someone about the dog.  (Dkt. 916 at 29; 21.)  When the agent returned from walking the dog, Agent Sharitt told Defendant Rau that he had picked her phone up from the table so she could make her calls.  (Dkt. 901-1 at 7:13:51.) Defendant Rau and the agents left her home, and she locked her door.  (*Id.* at 7:14:32.)  Agent Sharitt then gave her the phone.  (*Id.* at 7:14:55.)  He said he wanted her to make any

necessary  calls before they left as they were going to handcuff her while riding in the car.  (*Id.* at 7:15:01.)  She placed at least three calls before finally reaching her sister and explaining that she was being arrested, would be taken to the federal courthouse in Rome, and someone needed to look after the dog.  (*Id.* at 7:17:23.)  As the sister had several questions, Defendant Rau handed the phone to Agent Sharitt who then spoke to the sister before giving the phone back to her.  (*Id.* at 7:19:51–7:21:38.)  The last thing Defendant Rau said to her sister was to "get someone to get the dog."  (*Id.* at 7:22:06.)  When she started to make another call, saying "one more call," agents said she would have to do so from the car as they wanted to leave for the courthouse.  (*Id.* at 7:22:13.)  They agreed to cuff her hands in front so she could continue using the phone.  (*Id.*)

That was not a seizure.  It was the agents allowing her to use her phone immediately before (and even immediately after) her arrest so she could make whatever arrangements she needed for herself and her dog. Agent Sharitt testified that he was not thinking about whether her phone contained evidence when he removed it from the home.  (Dkt. 916 at 20.) If he had thought of it as evidentiary, he would not have allowed her to retain it in the car; he would have seized it.  (*Id.*)  Agent Arrugueta

11

likewise testified that he did not think he was holding her phone in order to seize it but rather because she had said she needed to call someone about the dog.  (Dkt. 915 at 8.)  If he had seized the phone, he would not have returned it to her.  (*Id.*)  While not controlling, the agents' testimony about what they were doing with the phone—that is, holding it temporarily to make sure Defendant Rau had a chance to make her calls—is consistent with the evidence contained on the videotape showing the agents cooperating with Defendant Rau and helping her arrange care for her pet.

Defendant Rau could have told the agents she no longer wanted to use her phone and put it back inside.  But, having reestablished possession of the phone from the agents, she chose to keep it with her so she could make additional calls.  She wanted to make one more call after having been placed in cuffs.  No evidence suggests the officers manufactured this scenario to justify their seizure of the phone.  The undisputed testimony from Agent Sharitt was that he picked up the phone in order to make sure Defendant Rau was able to call someone to care for her dog, just like she asked to do.  The Court, like Magistrate Judge Johnson, rejects Defendant Rau's claim that the agents seized her

phone when they picked it up off the table in her home and adopts the Magistrate Judge's conclusion that they seized it later during the drive to the courthouse. She was under arrest by that time, making the seizure reasonable under the Fourth Amendment.

## B.   Search of the Cell Phone

Defendant Rau also moved to suppress the search of her phone on the grounds that the warrant affidavit lacked probable cause. Specifically, she argued that the allegations contained in the warrant dated back to 2004, thus making them too stale to support the 2018 warrant. (Dkt. 757 at 4.)

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV.   A magistrate judge reviewing a warrant must make a practical, common-sense decision whether, given all the circumstances set forth in the probable cause affidavit, there is a fair probability that law enforcement will find evidence of a crime in a particular place. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999).   The affidavit should establish   a   connection   between   the   defendant   and   the   place   law

enforcement wants to search and a link between that place and any criminal activity. *See United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002). The law precludes reliance upon stale or outdated information. "For probable cause to exist . . . information supporting the government's application for a search warrant must be timely, for probable cause must exist when the magistrate judge issues the search warrant." *United States v. Harris,* 20 F.3d 445, 450 (11th Cir. 1994); *see also United States v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000) ("[I]nformation supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues."). No mechanical tests exist for deciding whether information is too stale to support a warrant. Rather, "staleness is an issue which must be decided on the peculiar facts of each case." *Bervaldi*, 226 F.3d at 1264. In doing so, courts should consider the "nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." *Harris,* 20 F.3d at 450. As part of this, courts should recognize the difference between isolated criminal activity (for which the passage of time is more likely to diminish probable cause) and protracted or

14

continuous criminal activity (for which the passage of time is less likely to dissipate probable cause.).  *Bervaldi*, 226 F.3d at 1265.

"[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis' for concluding that probable cause existed . . . ."  *Gates,* 462 U.S. at 250.  Courts must give "great deference" to a magistrate judge's decision and uphold a magistrate's findings even in marginal or doubtful cases.  *See United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990).  "Deference to the magistrate, however, is not boundless."  *United States v. Leon,* 468 U.S. 897, 914 (1984).  "[R]eviewing courts will not defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause."  *Id*. at 915 (internal quotation marks omitted).

The Magistrate Judge in this case correctly noted that, while the warrant affidavit referred to Defendant Rau's participation in the drug trafficking conspiracy as far back as 2004, it did not end there.  Instead, the affidavit detailed her participation in that illegal activity for nearly two decades.  It explained her 2004 efforts to stop a witness from testifying against her son (Jeffrey Bourassa), her 2008 involvement with

gang members to import and sell narcotics, her 2015 efforts to notify gang members of a cooperating witnesses, and her 2017 and 2018 efforts to remain in communication with incarcerated gang members. (Dkt. 1017-1 at 8–10.) It also explained that, following her arrest and the seizure of her phone, Defendant Rau instructed another gang member to throw away Rau's old phone number and that she would provide the gang member a number for a "throw away" phone at which Rau could be reached. (*Id*. at 10–11.) The affidavit established that she was involved in a prolonged criminal activity, that she used electronic media to communicate with gang members, and that she wanted a new phone number after her arrest to continue communicating with gang members. It also alleged that those involved in drug trafficking conspiracies often use cell phones to communicate (describing phones as "vital instruments" of drug trafficking) and that such devices store information for long periods of time. (*Id*. at 5, 7.) Based on all of this, the Magistrate Judge concluded the warrant information was not stale and that it established probable cause for the search of Defendant Rau's phone.

Defendant Rau voiced no objections to the Magistrate Judge's findings or recommendation in this regard. Having reviewed the

affidavit (indeed having done so de novo even though not required), the Court adopts that conclusion.

And even if the affidavit lacked probable cause, the Court would nonetheless deny Defendant Rau's motion to suppress because the United States would be entitled to the good faith exception to the exclusionary rule under *United States v. Leon*. In that case, the Supreme Court held that a district court should not exclude evidence obtained under a defective warrant unless the application and warrant are so defective or deficient that no reasonably well-trained officer could have relied on them. 468 U.S. at 925. Put differently, the exclusionary rule does not apply when an officer, acting with objective good faith, obtains a search warrant from a neutral magistrate judge and acts within the scope of the warrant. *Id.* at 920–21. The good faith exception does not apply in four instances, specifically when: (1) the judicial officer issues the warrant on a deliberately or recklessly false affidavit; (2) the judicial officer abandons his judicial role; (3) the warrant so lacks any indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that an officer could not reasonably presume it valid. *Id.* at 923.

There is no evidence that the subscribing agent intentionally or recklessly misled the issuing magistrate judge. There also is no basis to find the magistrate judge abandoned his "judicial role" in issuing the warrant. Given the affidavit allegations detailed above, it cannot be said that the warrant so lacks any indicia of probable cause or that it is so facially deficient that no reasonable officer would believe it valid. Even if probable cause did not exist to support the issuance of the warrant, suppression is inappropriate.[1]

## IV.  Conclusion

The Court **OVERRULES** Defendant Cheri Rau's Objections (Dkt. 1071), **ADOPTS** the Magistrate Judge's Report and Recommendation (Dkt. 1033), and **DENIES** Defendant Rau's Motions to Suppress Evidence (Dkts. 739; 757).

**SO ORDERED** this 21st day of December, 2020.



MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE

---

[1] The Magistrate Judge reached the same conclusion, and Defendant Rau raised no objection to it.